165 F.3d 1249
 99 Cal. Daily Op. Serv. 526, 99 Daily Journal
D.A.R. 630
BELLEVUE MANOR ASSOCIATES, Plaintiff-Appellant,
and
Boundary Village Apartments; Brandt Norwest Company;
Burien House Associates; Mary Carpinito; Cashmere Manor
Associates; Cedar Heights Partnership; Cedarwood Apartment
Investors; Centralia Manor Associates; Charter House
Associates; Chehalis Manor Associates; Eastwood Square
Associates; Emerson Manor Associates; Entiat Gardens
Limited Partnership; Ferndale Villa Limited Partnership;
Harbor Manor Associates; Gordon Hendrickson; Joanne
Hendrickson; Heritage Associates; Woodlake Manor III;
Homestead Associates; Kennewick Garden Court Associates;
Lakeview Manor; Woodland Green Associates; Magnolia
Apartment Investors; Kurtis R. Mayer; Pamela Mayer;
McKinley Terrace Associates; Meadow Park Garden Court
Associates; Monroe Apartment Associates; Montesano Harbor
Annex Co.; Northwood Square Associates; Olympian
Associates; Patricia Harris Manor Associates; Pine Garden
Properties; Skagit Village Associates; Southhill
Associates; Southwood Square Associates; Tacoma
Partnership; Marianne Uchimura; Minoru Uchimura; Vashon
Terrace Associates; Wenatchee House Associates; Wilbur
Manor Associates, Plaintiffs-Intervenors-Appellants,
v.
UNITED STATES of America, acting Through the Department of
Housing and Urban Development, Defendant-Appellee.
 No. 98-35148.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 4, 1998.
Decided Jan. 20, 1999.
 
 1
 Warren J. Daheim and Donald W. Hanford, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, P.L.L.C., Tacoma, Washington, for plaintiffs-appellants.
 
 
 2
 Wendy M. Keats, United States Department of Justice, Civil Division, Washington, D.C., for defendant-appellee.
 
 
 3
 Appeal from the United States District Court for the Western District of Washington; Barbara J. Rothstein, Chief Judge, Presiding. D.C. No. CV-86-01626-BJR.
 
 
 4
 Before: LEAVY and HAWKINS, Circuit Judges, and SHADUR,[1] District Judge.
 
 SHADUR, Senior District Judge:
 
 5
 This appeal stems from a dispute between private landlords who participate in the federal rent subsidy program familiarly known as "Section 8 housing" and the United States Department of Housing and Urban Development ("HUD") concerning what method HUD may use to calculate annual rent adjustments. Its procedural posture calls for us to address a question of first impression in this Circuit: the effect of the Supreme Court's decision in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) on this Circuit's prior standard for evaluating a Fed.R.Civ.P. ("Rule") 60(b)(5) petition brought on equitable grounds in a case that does not involve what has been characterized as "institutional reform litigation."
 
 Background
 
 6
 In 1974 Congress enacted the Section 8 low-income housing program embodied in 42 U.S.C. § 1437f ("Section 1437f"). Under that program tenants make rental payments to private landlords based on the tenants' income and ability to pay, and HUD subsidizes that rent with assistance payments intended to provide the landlords with a fair rent (see Cisneros v. Alpine Ridge Group, 508 U.S. 10, 12, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993)). HUD's payments make up the difference between each tenant's contribution and the "contract rent" agreed to by the landlord and HUD (id.), which is based on "fair market rental" plus an allowance for the costs of participating in the Section 8 program (Section 1437f(c)(1)). Under Section 1437f(c)(2)(A) the contracts with private landlords provide for periodic rent adjustments "to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula."
 
 
 7
 As originally enacted, Section 1437f(c)(2)(C) capped those adjustments in this fashion:
 
 
 8
 (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted units and comparable unassisted units, as determined by the Secretary.
 
 
 9
 In the early 1980s HUD began to conduct independent comparability studies.[2] It suspected that the rent adjustments it provided using the statutorily authorized "reasonable formula" were allowing landlords to collect total rents much higher than the market rents in their areas (Alpine Ridge, 508 U.S. at 14, 113 S.Ct. 1898). HUD used those studies to cap the rent payments that it made under Section 8 contracts (id.).
 
 
 10
 Bellevue Manor Associates and the other 43 appellants in this case (collectively "Bellevue," treated in the balance of this opinion as a singular-though collective-noun) are private landlords who entered into Housing Assistance Payment contracts with HUD to lease apartments to low-income tenants in return for federal rent subsidies. Bellevue filed for a declaratory judgment in 1986, asking the district court to declare that HUD was restricted to making its rent adjustments based on HUD's published "Automatic Annual Adjustment Factors" ("AAAFs") and that HUD was precluded from limiting future rent increases by using market rent comparability studies. Bellevue argued that HUD had chosen to adjust rent payments based on a "reasonable formula" (the AAAFs) as allowed by statute and had written that choice into the assistance contracts, so that HUD could not rely on a different method (comparability studies) to limit the periodic rent increases.
 
 
 11
 While Bellevue's case was pending before the district court, our court decided Rainier View Assocs. v. United States, 848 F.2d 988 (9th Cir.1988)(per curiam), a similar case dealing with Section 8 contracts. Rainier View involved contracts with rent adjustment provisions identical to those in this case. And Rainier View, 848 F.2d at 990-91 held that because HUD had elected the formula method for rent adjustments in the Section 8 contract, it could not rely on the market comparability method. In 1989 the district court in this case adhered to Rainier View by granting declaratory and injunctive relief to Bellevue, requiring HUD to rely solely on the AAAFs in adjusting the Section 8 rent subsidies.
 
 
 12
 Within months after the issuance of that ruling the statutory and decisional law regarding Section 8 rent adjustments changed. In December 1989 Congress responded to the Rainier View decision and the controversy over HUD's adjustment methods by passing Section 801 of the HUD Reform Act (Pub.L.101-235). Section 801 offered a compromise: It specifically authorized HUD to limit future Section 8 rent adjustments by using market comparability studies, but it provided Section 8 landlords with a partial return of the adjusted rents that they had been denied through the use of comparability studies before the enactment of the 1989 legislation (see Alpine Ridge, 508 U.S. at 15, 113 S.Ct. 1898).
 
 
 13
 One more historical fact carries significance: In 1993 Alpine Ridge upheld Section 801 and found that the landlords did not have pre-existing contract rights to "formula-based rent adjustments that materially exceed market rents for comparable units" (id. at 21, 113 S.Ct. 1898). In other words, the Supreme Court found that the Alpine Ridge contract provisions, which are the same as those at issue here, did not guarantee landlords the right to rent adjustments based solely on the AAAFs without consideration of market rents in the area. In so doing Alpine Ridge expressly rejected the Rainier View holding (id. at 17, 19, 113 S.Ct. 1898).
 
 
 14
 Because the 1989 declaratory judgment and injunction in this case had been entered against HUD to conform to our court's later-discredited opinion in Rainier View, HUD petitioned under Rule 60(b)(5) for relief from those 1989 orders. In 1995 the district court summarily granted the government's motion, and Bellevue appealed to our court. Because recent Supreme Court cases had thrown into doubt the appropriate standard for assessing such a Rule 60(b)(5) motion, on September 8, 1997 we issued an unpublished memorandum disposition (Bellevue Manor Assocs. v. United States, 1997 WL 582818, cited in table, 124 F.3d 210 (9th Cir.1997)) that vacated and remanded the district court's decision for the entry of appropriate findings as to that standard.
 
 
 15
 On remand the district court determined that it need not decide what standard should apply because HUD had met the requirements of the most stringent test, and so the court again granted the relief requested. Bellevue then took the current appeal.
 
 Jurisdiction
 
 16
 Just a few words are in order at the outset as to the finality (and hence appealability) of the order below under 28 U.S.C. § 1291. By its literal terms the district court's decision vacated only the permanent injunction against HUD, without explicitly addressing the declaratory judgment. Earlier in its opinion, however, the district court made the point "that this declaratory judgment, which has prospective application, is akin to an injunction and the requested relief is the same as that requested from the injunction." We therefore view both the injunction and the declaratory judgment as having been vacated, so that the decision below was the final disposition in the case for jurisdictional purposes.
 
 Standards of Review
 
 17
 We review for abuse of discretion the district court's granting of relief under Rule 60(b)(5) (Transgo, Inc. v. Ajac Transmission Parts Corp., 911 F.2d 363, 365 (9th Cir.1990); 11 Charles Alan Wright et al., Federal Practice and Procedure ["Wright & Miller "] § 2857, at 255 (2d ed.1995)). De novo review is appropriate for the question as to which legal standard should be used to assess a party's Rule 60(b)(5) motion.
 
 Applicability of Rule 60(b)(5)
 
 18
 Rule 60(b)(5), which creates an exception to the doctrine of claim preclusion, provides parties with standards under which they may attack judgments already deemed final:
 
 
 19
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.
 
 
 20
 In so doing, the Rule codifies the courts' traditional authority, "inherent in the jurisdiction of the chancery," to modify or vacate the prospective effect of their decrees (see Safe Flight Instrument Corp. v. United Control Corp., 576 F.2d 1340, 1343 (9th Cir.1978)(per curiam), quoting the seminal opinion in United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932)).
 
 
 21
 HUD invokes the final ground for relief set out in the Rule: that it is no longer equitable for the judgment to operate prospectively. In response Bellevue interposes a challenge to any use of that ground in this case because it deals with a purely private commercial contract. In arguing for such a per se bar, Bellevue urges that no court has ever prospectively vacated a declaratory judgment interpreting commercial contract rights and that HUD's presence as a contracting party does not render the contract any less private and commercial than one between two private parties.[3] HUD counters both that there is no " 'commercial contract' exception" to the Rule and that in all events the present claim is essentially statutory in nature.
 
 
 22
 To begin with, Bellevue can identify nothing in the plain language of the Rule that excepts (or calls for any different treatment of) final judgments that interpret commercial contracts. In fact Rule 60(b)(5) is routinely used to challenge the continued validity of consent decrees, which courts often liken to contracts[4] (see, e.g., W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc., 977 F.2d 558, 561 (Fed.Cir.1992)). Furthermore, courts have applied the Rule in essentially "private" cases (see, e.g., Protectoseal Co. v. Barancik, 23 F.3d 1184 (7th Cir.1994), upholding under Rule 60(b)(5) the dissolution of an injunction prohibiting a competitor from serving as a corporation's director). Although there is of course a strong interest in the finality of a final judgment interpreting a commercial contract, it is not clear how such a judgment is fundamentally different from, say, a final judgment interpreting parties' trademark and copyright rights, something that this Court has reviewed in Rule 60(b)(5) terms (see Transgo, 911 F.2d at 365).
 
 
 23
 Moreover, the contract at issue in this case is not nearly so private as Bellevue would have us believe. It exists only because Congress authorized its terms by enacting Section 8. As HUD points out, this Court sitting en banc has already explained that a claim arising under an identical contract, "although 'contract-related,' rests at bottom on statutory or regulatory rights" (Rainier View Assocs. v. United States, No. 86-3685 (9th Cir. March 7, 1988)(unpublished order), asserting jurisdiction over a similar claim). And it cannot be said that the parties negotiated the contract provisions at issue in an arm's length process, as Bellevue would suggest, because the provisions are in a standardized form identical to those entered into by many other landlords, including the plaintiffs in Rainier View and Alpine Ridge.
 
 
 24
 Indeed, even if the source of Bellevue's rights could be viewed as a bargained-for private contract (an extraordinarily doubtful assumption), it is unclear why that should render Rule 60(b)(5) inapplicable. In that event the private nature of the dispute might be a factor in assessing whether HUD should prevail in its attack on the final judgment, but it would not prevent HUD from petitioning for relief under the Rule.
 
 
 25
 Accordingly we reject Bellevue's contention that we should create a per se bar against HUD's moving for relief under Rule 60(b)(5) if the original final judgment were to be considered to have involved the interpretation of a commercial contract. Instead Rule 60(b)(5) is available as a potential source of relief, and we must turn to a determination of what legal standard to use in that respect.
 
 Rule 60(b)(5)'s Standard
 
 26
 Until the 1992 decision in Rufo, which addressed how to evaluate at least some petitions brought under the equity provision of Rule 60(b)(5), this Circuit's standard for relief under that Rule was set forth in the 1990 Transgo decision. There the defendants had moved under Rule 60(b)(5) to modify a post-trial permanent injunction in a trademark and copyright infringement case, and we specified (911 F.2d at 365) a three-part test that a party must meet to gain relief under the "equity" provision of Rule 60(b)(5):
 
 
 27
 (1) a substantial change in circumstances or law since the order was entered;
 
 
 28
 (2) extreme and unexpected hardship in compliance with the order; and
 
 
 29
 (3) a good reason why the court should modify the order.
 
 
 30
 In this court's initial review of the district court's summary grant of HUD's motion, we remanded and instructed the district court to determine whether HUD had met the Transgo test or, perhaps, whether Rufo had supplanted Transgo (see Bellevue, 1997 WL 582818, at * 2). On remand the district court found that HUD had satisfied the three Transgo factors. Although we later hold that the less stringent Rufo standard applies to this case, out of respect for the district court's efforts undertaken at this court's direction we will first review that Transgo determination. Taking each factor in turn, we conclude that the district court did not abuse its discretion in finding that HUD satisfied Transgo and therefore merited relief in those terms.
 
 
 31
 First, as both sides agree, HUD has met the first factor because there was a clear change of law in the Alpine Ridge decision. Plainly the district court could not have issued the original injunction against HUD had the Supreme Court already decided Alpine Ridge.
 
 
 32
 Second and most difficult to meet, HUD must show that it faced "extreme and unexpected hardship." On that score the district court found the existence of such hardship because of HUD's contradictory legal obligations: If HUD complies with Congress' statutory commands it violates the injunction, but if it complies with the injunction it violates the amended statute. Though that argument is somewhat circular in nature, and by itself it would seem a thin reed on which to premise relief under the Transgo standard, there is an additional consideration that tips the balance in HUD's favor.
 
 
 33
 By its nature the Section 8 program is designed to benefit low-income tenants, not the private landlords who enter into assistance contracts. To leave the injunction in place in Bellevue's favor, giving it a preferred position over every other participating landlord, would correspondingly decrease the amount available to HUD for supporting all other Section 8 projects. Because HUD necessarily has a limited amount of money (a function of congressional appropriations) to spend on Section 8 programs, fewer low-income tenants would then have the opportunity to participate in the Section 8 program through other landlords-and only because the Bellevue landlords were receiving a disproportionately larger share of HUD funds. Thus leaving the injunction in place would harm the very class of low-income tenants that the statute was designed to help, while giving the Bellevue landlords preferential treatment even though they had signed exactly the same contracts as other landlords. We conclude that HUD has sufficiently demonstrated "extreme and unexpected hardship" to meet the second element of the tripartite Transgo test.
 
 
 34
 Finally, the district court correctly found that the injunction's enforcement of rights that the Supreme Court does not recognize and that the statute no longer permits provided a "good reason" for court modification. HUD has therefore satisfied the third criterion as well.
 
 
 35
 In sum, the district court did not abuse its discretion in finding that HUD met the Transgo test-assuming the continued viability of that test-and in vacating the prospective relief that the court had granted in 1989. But because there is a serious question whether, as to all Rule 60(b)(5) petitions brought on equitable grounds, the more stringent set of factors set out in Transgo has survived Rufo and its pronouncement of a more flexible standard, we go on to resolve that issue. We then follow that resolution by examining the substantive issue in this case in Rufo terms.
 
 
 36
 In that regard, our analysis first turns to a more detailed look at the cases at issue. As for Transgo, this Court developed its three-part test in reliance on Swift, a case pre-dating Rule 60(b)(5) that denied relief to meat packers who had attempted to change the terms of a consent decree prohibiting them from entering the grocery business. Swift, 286 U.S. at 119, 52 S.Ct. 460 stated:
 
 
 37
 [T]hey [the defendants] are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.
 
 
 38
 Based on that language, most courts, including this Circuit, established comparably strict standards for the granting of relief under the equity provision of Rule 60(b)(5).
 
 
 39
 As stated earlier, the more recent Rufo decision involved what the Supreme Court has referred to as "institutional reform litigation." There the parties had entered into a consent decree to correct unconstitutional conditions at the county jail. Invoking Rule 60(b)(5), the government petitioned for a modification of the decree on the grounds that changed circumstances rendered continued compliance inequitable (Rufo, 502 U.S. at 376, 112 S.Ct. 748). Rufo, id. at 393, 112 S.Ct. 748 rejected the strict Swift standard and set out a new, more flexible standard: There must be "a significant change in facts or law [that] warrants revision of the decree," and "the proposed modification [must be] suitably tailored to the changed circumstance." Although Rufo clearly abandons Swift in the context of institutional reform litigation, the parties dispute how broadly its holding extends.
 
 
 40
 On the earlier appeal in this case, this court recognized the possibility that a distinction might exist between cases in which Rufo applied and those in which Transgo applied (see Bellevue, 1997 WL 582818, at * 1). It asked the district court for findings of fact that would bear on classifying this case as more akin to "institutional reform" cases or "purely private" cases (id., at * 2). Indeed, other Courts of Appeals as well as scholarly commentators disagree somewhat about whether Rufo applies only to institutional reform cases or whether it overrules the strict Swift standard in a broader sense-contrast 12 James W. Moore et al., Moore's Federal Practice ["Moore's "] § 60.47[b], at 60-162 & n. 17 (3d ed.1998) (collecting cases) ("The better view clearly is that the flexible, Rufo standard should not be limited to 'institutional reform' litigation because it 'is not less suitable to other types of equitable cases' ") with the purported distillation in 11A Wright & Miller § 2961, at 402 (2d ed. 1995) ("Courts considering modifications in other contexts have not adopted the Rufo ... approach, however. Rather, they have limited the holdings to those areas and have continued to apply the 'grievous wrong' standard of Swift to other contexts"); cf. 12 Moore's § 60.47[b], at 60-162 & n. 16 (listing just two cases as "hav[ing] expressed doubts" in that respect).
 
 
 41
 For our part, further elaboration by the parties to this appeal and our own in-depth consideration of the subject have led us to determine that the argued-for distinction does not stand up to scrutiny. For the reasons that we express hereafter, we join a significant number of other Courts of Appeals in finding that Rufo sets forth a general, flexible standard for all petitions brought under the equity provision of Rule 60(b)(5).[5]
 
 
 42
 Both the language in Rufo and the Supreme Court's most recent decision in Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) support the implied abrogation of Transgo and the adoption of a more flexible standard for evaluating motions that seek to invoke the equity provision of Rule 60(b)(5). Rufo pointed out that the stringent language in Swift-that only a "grievous wrong" could warrant relief (286 U.S. at 119, 52 S.Ct. 460)-"was not intended to take on a talismanic quality" (502 U.S. at 380, 112 S.Ct. 748). That language appropriately reflected the specific circumstances of the Swift case, but it had been incorrectly construed by lower courts as a general standard for Rule 60(b)(5) motions (id. at 379-81, 112 S.Ct. 748). Indeed, this Circuit's opinion in Transgo, 911 F.2d at 365 had explicitly relied on Swift 's strong language when it set out its strict three-part test, even introducing the three factors with the words "Under the Swift requirements...." But Rufo, 502 U.S. at 380, 112 S.Ct. 748 thereafter rejected the strict Swift approach to Rule 60(b)(5):
 
 
 43
 That Rule, in providing that, on such terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application, permits a less stringent, more flexible standard.
 
 
 44
 Five years later Agostini likewise applied Rufo 's new flexible standard in providing relief from a permanent injunction based on later-discredited Establishment Clause jurisprudence. In so doing the Supreme Court used language to describe the claim before it that could equally be used to describe the case now before us: "This litigation involves a party's request under Rule 60(b)(5) to vacate a continuing injunction entered some years ago in light of a bona fide, significant change in subsequent law" (521 U.S. at 238-39, 117 S.Ct. 1997). Although the injunction at issue in Agostini-entered against a school district for Establishment Clause violations-may have had a more public nature than the injunction issued here, Agostini, id. at 215, 117 S.Ct. 1997 cited Rufo 's standard generally without limiting it to "institutional reform" cases or to those that significantly affect the public.
 
 
 45
 In addition to being faithful to the recent Supreme Court cases, a flexible standard obviates any need to pigeonhole cases by attaching such possibly imprecise labels as "institutional reform," "commercial" or some other designation. Instead the Rufo-Agostini approach allows courts to fulfill their traditional equity role: to take all the circumstances into account in determining whether to modify or vacate a prior injunction or consent decree. As stated in Building and Constr. Trades Council, 64 F.3d at 888:
 
 
 46
 Accordingly, the standard for modifying an injunction cannot depend on whether the case is characterized as an institutional reform case, a commercial dispute, or private or public litigation. Different considerations may have greater or lesser prominence in different cases, not because the cases are characterized one way rather than another but because equity demands a flexible response to the unique conditions of each case.
 
 
 47
 We agree that it makes little sense to be required to precede the consideration of general equitable principles with an assessment of whether the case at hand is a "Rufo " case or a "Transgo-Swift " case. As Alexis Lichine, 45 F.3d at 586 has put it:
 
 
 48
 In our view, Rule 60(b)(5) sets forth the umbrella concept of "equitable" that both Swift and Rufo apply to particular, widely disparate fact situations.
 
 
 49
 Just as the Supreme Court has done, lower courts may properly consider such factors as the greater interest in finality posed by a purely private commercial case and the broader impact of a sweeping public-litigation-type injunction in determining whether to modify or vacate prior relief.
 
 
 50
 In sum, we now recognize that Transgo no longer provides a permissible test for Rule 60(b)(5) motions brought on the ground that changed circumstances have rendered it inequitable to leave the challenged order in place. Rufo 's mandate prevents us from continued reliance on Transgo, as does the sound policy behind courts' traditional equitable power to modify prospective relief. Accordingly we hold that the Rufo standard applies to all Rule 60(b)(5) petitions brought on equitable grounds.
 
 
 51
 It requires only a moment to apply Rufo 's general equitable approach to this case. As taught by In re Pintlar Corp., 133 F.3d 1141, 1145 (9th Cir.1998), quoting Foster v. Skinner, 70 F.3d 1084, 1089 (9th Cir.1995):
 
 
 52
 Remand is not necessary where the issue has been fully briefed on appeal, the record is clear and remand would "impose needless additional expense and delay...."
 
 
 53
 Here the equities in the case clearly tip in favor of HUD. For the same reasons that we have found that HUD met the tougher Transgo test-the change in law, HUD's loss of funds to support other Section 8 programs and the unfair preferential treatment of these landlords-HUD easily satisfies the Rufo standard.
 
 Conclusion
 
 54
 We AFFIRM the district court's granting of relief on two grounds: First, the district court did not abuse its discretion in finding that HUD met the strict Transgo test. Second, even if HUD could not have satisfied that stringent test, the more flexible Rufo standard is the appropriate test to apply, and HUD clearly meets that standard.
 
 
 55
 One final note about the relief granted below: As explained in the Jurisdiction section of this opinion, the district court's order expressly vacated only the permanent injunction against HUD without speaking to the declaratory judgment. But given the discussion of both forms of relief in the district court's opinion, we have treated the order as vacating both the declaratory judgment and the injunction,[6] and that is the judgment we AFFIRM.
 
 
 
 [1]
 Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [2]
 Section 1437f(c)(2)(C) was fleshed out in 1989, in part to formalize what HUD had already been doing:
 (C) Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary. In implementing the limitation established under the preceding sentence, the Secretary shall establish regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments under subparagraph (A) would result in such material differences.
 
 
 [3]
 Bellevue cites United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) for the proposition that government contracts should be treated in the same way as contracts between private parties. But the underlying reason for such parallel treatment, as described in Justice Souter's plurality opinion, is to serve "the Government's own long-run interest as a reliable contracting partner in the myriad workaday transactions of its agencies" (id. at 883, 116 S.Ct. 2432). That interest was acute in Winstar because, as all parties there recognized, the statute at issue retroactively changed the contract terms between the government and the financial institutions. In our case, however, the parties disputed-and Alpine Ridge has determined-what the terms of the contract meant in the first instance, before Congress enacted Section 801. Furthermore, Winstar does not even address Rule 60(b)(5). Winstar 's rationale is therefore not applicable to this case
 
 
 [4]
 It might be argued with some force that there is even less of a basis to disrupt a consent decree to which all parties agreed (which thus truly partakes in part of the nature of a contract) than a court-issued final judgment that had been contested by at least one party (cf. System Federation No. 91 v. Wright, 364 U.S. 642, 648, 650-52, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961))
 
 
 [5]
 For other opinions confirming the applicability of the flexible Rufo standard beyond the institutional reform context, see Building and Constr. Trades Council v. NLRB, 64 F.3d 880, 887-88 (3d Cir.1995), holding that Rufo requires a balancing test for all petitions brought under the equity provision of Rule 60(b)(5)(the Third Circuit had been one of the two listed by Moore's as "hav[ing] expressed doubts" on the subject, but this case resolved those doubts in favor of adopting the same position that we take today); United States v. Western Elec. Co., 46 F.3d 1198, 1203 (D.C.Cir.1995) ("Rufo gave the 'coup de grace' to Swift [;] the Supreme Court's summary of what might render a modification 'equitable' relates to all types of injunctive relief"); Alexis Lichine & Cie. v. Sacha A. Lichine Estate Selections, Ltd., 45 F.3d 582, 586 (1st Cir.1995), characterizing Rufo and Swift as "polar opposites of a continuum in which we must locate the instant case"; In re Hendrix, 986 F.2d 195, 198 (7th Cir.1993), holding that the Rufo standard applies across the board and allows modification of injunctions whenever equity principles so require; cf. Patterson v. Newspaper & Mail Deliverers' Union, 13 F.3d 33, 38 (2d Cir.1993), opting "to apply a flexible standard" in situations other than those involving institutional reform of an instrumentality of government. Plainly the heavy weight of authority conforms not to the Wright & Miller characterization but rather to what Moore's characterizes as the better view: that Rufo establishes a general, flexible standard not limited to institutional reform cases. It is worth noting that the earlier-quoted Wright & Miller reference to "Courts" as assertedly not having adopted Rufo in other contexts is misleading, for the authors (in an edition that was published in 1995 and was obviously written a bit earlier) cite only a single case for that proposition, while the treatise's 1998 pocket part cites only Alexis Lichine and none of the group of other cases that really put the lie to the Wright & Miller text
 
 
 [6]
 It was appropriate to apply Rule 60(b)(5) to vacate not only the injunction but also the declaratory judgment in this case because, as evidenced by the injunction directly enforcing it, this declaratory judgment has prospective effect (see 12 Moore's § 60.47[d], at 60-159)