**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0173n.06

**No. 08-5765**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Mar 19, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MICHAEL H. McKIM, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | APPEAL FROM THE DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| NEWMARKET TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE:  CLAY and McKEAGUE, Circuit Judges; and POLSTER, District Judge.[*]

**Dan Aaron Polster, District Judge.**  Appellant appeals the district court's grant of summary judgment in favor of Appellee and denial of Appellant's motions for summary judgment and to vacate, alter or amend judgment.  The district court found that a subscription agreement does not add new and material conditions to a settlement the parties had previously reached.  For the following reasons, we affirm.

**I.  FACTS AND PROCEDURAL HISTORY**

Appellant Michael McKim ("Appellant") was Vice-President of Research and Development for IPVoice Communications, Inc., now known as Appellee NewMarket Technology, Inc.

---

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

1

("Appellee"), until his voluntary resignation on September 17, 1999. Appellant sued Appellee on May 20, 2000, in the United States District Court for the Western District of Kentucky, claiming that, under his employment agreement, he was entitled to recover 1,050,000 shares of NewMarket stock. The case was dismissed on November 19, 2001, when the parties reached a settlement providing Appellant with $5,000 to be paid in seven installments and 350,000 shares of NewMarket stock, which Appellant could register whenever Appellee conducted a public offering.

The same day that Appellee executed the settlement agreement its board of directors voted to reverse split the company's stock on a 30:1 basis. Consequently, Appellant received 11,667 shares of the post-reverse split stock instead of 350,000 shares, though the overall value of the stock and his percentage of outstanding shares did not change. Nevertheless, on April 14, 2004, Appellant brought another suit in the Western District of Kentucky requesting a declaration of rights and alleging that Appellee committed fraud and breach of contract by reverse splitting its stock. The parties agreed to mediate their dispute in front of Magistrate Judge Whalin on November 16, 2004. At the mediation, the parties reached an agreement on the major issues in the case. A document outlining the terms agreed upon was drafted by Magistrate Judge Whalin and executed by counsel for the parties; however, no copy of the document has been produced by the parties.[1] As characterized in Appellant's complaint and admitted by Appellee, the parties agreed that Appellant would receive:

> (a) an executed general release releasing McKim and his Associated Persons from any and all claims that could have been asserted in the Litigation;

---

[1] Appellant has asserted both that a copy of the document was "retained in Judge Whalin's records" (Dist. Ct. Dkt. 1 at ¶ 22; Appellant Brief at 17) and that a copy "does not survive." (Dist. Ct. Dkt. 9-1 at 1; Dist. Ct. Dkt. 13 at 3 n.3.) Appellee has generally remained silent on the issue in its briefing. Nevertheless, the parties do not dispute the specific terms agreed upon during the mediation with Magistrate Judge Whalin.

2

(b) a $5,000 cash payment;

(c) a re-issued $1,000 check that had been previously issued;

(d) 300,000 shares of NewMarket Technology (trading symbol NMKT.OB);

(e) a letter from New Market's counsel regarding McKim's ability to immediately trade the 11,667 shares of IPVoice stock already in his possession;

(f) an agreement to provide information and documentation necessary to convert McKim's 11,667 share[sic] of IPVoice stock to NewMarket Technology trading shares;

(g) a letter from New Market's counsel regarding when McKim would be able to freely trade the above identified 300,000 restricted shares of NewMarket Technology common stock. Such documentation was to be delivered in fully executed form promptly after settlement. If it became possible for McKim's restricted shares to become tradeable at a date earlier than the one identified in the NewMarket's counsel's letter NewMarket was to use its best efforts to insure that the restrictions on McKim's shares were lifted and available for trade at the earliest possible date. However, nothing in the agreement was to require McKim to trade any shares owned by him at any given time;

(h) . . . a late fee of $250 per day for each day NewMarket is late in performance and any costs incurred by McKim to enforce this provision including attorney's fees.

(Dist. Ct. Dkt. 1at ¶ 22; Dist. Ct. Dkt. 5 at ¶ 20.)

Following the mediation, the parties continued their settlement negotiations and participated in teleconferences with Magistrate Judge Whalin on December 3, 2004, and December 15, 2004.

On January 5, 2005, Appellee's counsel sent Magistrate Judge Whalin a letter stating:

"This confirms the settlement conversations Trace Champagne and I had yesterday. Mr. Champagne and I have agreed to resolve the above-referenced matter on behalf of our clients. The parameters of the settlement agreement include the issuance of 300,000 shares restricted IPVoice stock to Mr. McKim and the 11,667 shares of IPVoice stock previously issued to Mr. McKim, a confidentiality agreement, and a cash payment of $5,000 to Mr. McKim and the reissuance of the $1,000 check previously issued by IPVoice to Mr. McKim. In addition, IPVoice will also provide an opinion letter from counsel as to when the 300,000 shares and the 11,667 shares of IPVoice stock may be eligible for free trading. In addition, the parties will

3

negotiate appropriate language to ensure that the 300,000 shares of restricted stock are issued in a timely manner. ... We will prepare a more formal settlement agreement and will keep the Court updated on the matter ..."

(Dist. Ct. Dkt. 1at Ex. 6.)

On January 6, 2005, the district court dismissed the case as settled with leave to reinstate within 30 days. Appellee's counsel tendered drafts memorializing the settlement agreement on January 14, 2005, and January 28, 2005. On February 10, 2005, Appellee's counsel tendered a third draft of the settlement agreement. Appellant's counsel reviewed the draft, made minor comments, and returned it to Appellee. Appellee's counsel incorporated the comments, sent a fourth draft to Appellant's counsel that same day and recommended that closing should occur on February 16, 2005. On February 11, 2005, Appellant signed this version of the draft and faxed the signed documents to Appellee.

On February 15, 2005, Appellee's counsel notified Appellant's counsel that Appellee would not be able to issue "the type of letter that McKim wants regarding the stock restriction issue" and that, instead, "NewMarket's approved SEC counsel must do the type of opinion McKim is seeking." (Dist. Ct. Dkt. 8-20.) Accordingly, closing did not occur on the formal settlement. After Appellee's counsel had numerous meetings with its SEC counsel, it sent a revised settlement agreement to Appellant's counsel on February 28, 2005, which required Appellant to execute an undefined subscription agreement along with the issuance of the NewMarket shares. Appellant refused to sign the subscription agreement. On October 24, 2005, Appellee's counsel forwarded a sixth draft agreement, this time with a written subscription agreement, requiring, among other things, that Appellant be an accredited investor. Once again, Appellant refused to sign the subscription agreement.

On November 1, 2006, and March 19, 2007, Appellee's counsel sent revised drafts to Appellant containing a subscription agreement but ultimately increasing the number of shares offered from 300,000 to 450,000. Appellant continued to refuse to sign the subscription agreement. In June 2007, the parties sought Magistrate Judge Whalin's intervention. Magistrate Judge Whalin expressed concern that the court retained subject matter jurisdiction but granted Appellant leave to file a formal motion to re-open the matter or to file a separate action for breach of contract. Appellant filed a new action on June 27, 2007, requesting a declaration of rights, and alleging breach of contract and fraud.

The parties agreed that there were no material disputes of fact and filed cross-motions for summary judgment. The district court held oral argument on March 13, 2008. On March 19, 2008, the district court granted summary judgment in favor of Appellee and denied Appellant's motion for summary judgment. In its ruling, the district court found that the parties' settlement agreement was ambiguous and therefore extrinsic evidence could be examined. The district court further found that the subscription agreement did not add new and material conditions to the settlement.

On March 28, 2008, Appellant moved, pursuant to Rule 59(e), to vacate, alter or amend the district court's judgment. Appellant's motion was denied by the district court on May 20, 2008. Appellant then filed the instant appeal, arguing that the district court erred by granting Appellee's motion for summary judgment, denying his motion for summary judgment, and denying his motion to vacate, alter or amend judgment. The matter has now been fully briefed and the parties have waived oral argument.

## II. JURISDICTION

The Court has appellate jurisdiction over this matter pursuant to 28 U.S.C. § 1291, and Federal Rules of Appellate Procedure 3 and 4(b), granting the Court of Appeals jurisdiction to review all final decisions of the district courts.

## III. STANDARD OF REVIEW

The parties do not agree on the standard of review for the district court decision. Appellant agues that review of the lower court's opinion should be *de novo*. Appellee contends that because the parties agreed to determine the case on the merits by cross-motions for summary judgment, the standard of review is whether the district court clearly erred by finding that the subscription agreement did not alter Appellant's rights under the settlement agreement.

A district court's grant of summary judgment is reviewed *de novo*. *See Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.*, 339 F.3d 428, 433 (6th Cir. 2003). "The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation." *Ferro Corp. v. Cookson Group*, 585 F.3d 946, 949 (6th Cir. 2009); *see also Converge, Inc. v. Topy America, Inc.*, 316 Fed App'x 401, 404 n.1 (6th Cir. 2009) (holding that while an abuse of discretion standard applies to a motion to enforce a settlement agreement, a grant of summary judgment in a breach of contract suit based on a settlement agreement is reviewed *de novo*). Appellee cites to *Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 741-42 (7th Cir. 2003) for the proposition that the clearly erroneous standard is used when litigants waive trial and ask the district court to decide the case as if the pretrial record were a trial record. However, *Cook*, a Seventh Circuit case, is not binding on this Court. Moreover, there is nothing in the record suggesting that the parties waived trial in this instance. "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side

6

or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts ..." *Ferro*, 585 F.3d at 949-50. Accordingly, the Court will conduct a *de novo* review of the lower court decision. Because this matter is in federal court based upon diversity jurisdiction, 28 U.S.C. §1332, the Court will apply the law of Kentucky, the forum state, to substantive issues.

## IV. ANALYSIS

Appellant argues that the district court erred by: (1) granting summary judgment to Appellee; (2) denying summary judgment to Appellant; and (3) denying Appellant's Rule 59(e) motion to vacate, alter or amend Judgment.

Appellant asserts that the district court incorrectly granted summary judgment to Appellee by: (1) finding that the contract was ambiguous and therefore using extrinsic evidence to determine that the subscription agreement should be part of the contract; and (2) holding that the subscription agreement, which required Appellant to comply with Regulation D of the Securities Act of 1933 (the "Securities Act") and to make various representations, warranties, and indemnifications, did not add material burdens or terms to the settlement.

Because a settlement is a type of contract, interpretation of the terms of a settlement are governed by contract law. *See Frear v. PTA Industries, Inc*., 103 S.W.3d 99, 105 (Ky. 2003). Contractual terms are ambiguous if they are "reasonably susceptible to different or inconsistent interpretations." *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992). "If an ambiguity exists, the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written, by evaluating extrinsic evidence as to the parties' intentions." *Frear*, 103 S.W.3d at 106 (citations omitted). Parol evidence may be

7

introduced to ascertain the true meaning of ambiguous or uncertain terms of a contract. *Hammon v. Kentucky Cent. Life & Acc. Ins. Co.*, 289 S.W.2d 726, 728 (Ky. 1956). "However, in the absence of ambiguity a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear*, 103 S.W.3d at 106 (citations omitted).

The district court erred in finding that the agreement reached by the parties was ambiguous. The parties do not disagree that a contract was formed, nor is there disagreement on the essential terms of the contract. Rather, the only dispute is whether Appellant should be required to sign a subscription agreement that both parties agree was not specifically included in the contract. Paragraph 9(h) of the February 11 draft of the settlement agreement, signed by Appellant, states that "[e]ach party shall execute such additional documents and take such further actions as shall be reasonable and necessary to carry out the provisions of this Agreement." (Dist. Ct. Dkt. 1-12 at ¶9(h).) Thus, the only issue in dispute is whether the subscription agreement is "reasonable and necessary" to effectuate the settlement. This is a matter of law for the Court to decide.

Under the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77a *et seq.*, it is unlawful to issue a security without the filing of a registration statement, unless there is an exemption from registration. 15 U.S.C. § 77e(c). One such exemption (the "Section 4(2) exemption") exists for transactions "by an issuer not involving any public offering." 15 U.S.C. § 77d(2). However, the Section 4(2) exemption does not apply if the security is issued to an "underwriter," defined as a "a person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(a)(11). Regulation D, promulgated under the Securities Act, establishes three registration exemptions and

8

can ensure that the person to whom the securities are issued is not considered an underwriter. 17 C.F.R. § 230.501 *et seq*. The relevant exemption for purposes of the instant case is Rule 506 of Regulation D, which if complied with, provides a safe-harbor that will qualify the offering for the Section 4(2) exemption and therefore will not be considered a public offering. 17 C.F.R. § 230.506. Rule 506 is limited to those considered to be accredited investors and sophisticated non-accredited investors. *Id*.

Because of Appellant's status as a former insider, Appellee feared that Appellant may be considered an underwriter and therefore believed Appellant needed to sign a subscription agreement prior to the issuance of 300,000 shares of unregistered stock. The subscription agreement stated that the stock was being issued pursuant to Regulation D, that Appellant was an accredited investor, and required Appellant to make various representations, warranties and indemnifications.

Compliance with Regulation D ensures that the offering is exempt under Section 4(2). *See e.g., Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 905 (6th Cir. 2007). However, the stock can be issued pursuant to other exemptions. *See* 15 U.S.C. § 77d. The subscription agreement serves a protective function. By requiring Appellant to make various representations and warranties and to indemnify Appellant, the subscription agreement ensures Appellee will not lose the benefit of Regulation D and Section 4(2), and shields Appellee from possible securities liability if Appellant rashly re-sells the stock.

Though unregistered stock can only be issued pursuant to an exemption, such as Regulation D, Appellant argues that the subscription agreement creates burdens that materially alter the nature of the settlement. Specifically, Appellant contends that being required to comply with Regulation D, to make various pre and post-transaction representations, warranties, and indemnifications, and

to receive a letter from Appellee's counsel before the restrictive legend on the unregistered stock can be removed for purposes of re-sale of the stock, creates material obligations that were not bargained for.

We disagree, and find that the subscription agreement is a reasonable method for effectuating the agreed-upon essential terms of the settlement. In particular, the subscription agreement enables Appellee to lawfully issue the 300,000 unregistered shares to Appellant while not altering: (1) the general release; (2) the $5,000 in cash; (3) the re-issued check for $1,000; (4) the letter regarding Appellant's ability to trade the 11,667 shares he already possessed; (5) the documentation necessary to convert IPVoice stock to NewMarket stock; or (6) the letter from Appellee's counsel regarding when Appellant would be able to freely trade the 300,000 shares of restricted stock.

Appellant makes much of the fact that the district court's order "assumes that the requirements of Regulation D are the controlling law and necessary for the Appellee to issue the shares in furtherance of the settlement..." (Appellant Brief at 39.) While Regulation D is not the sole means by which the unregistered stock can be transferred to Appellant, Appellant was presented numerous opportunities to offer a different exemption under which the stock could be issued, and failed to do so. In his appellate brief, Appellant raises the possibility of an exemption pursuant to Section 3(a)(10) of the Securities Act, 15 U.S.C. § 77c(a)(10), which would make the unregistered shares immediately tradable. However, there is no evidence that Appellant raised the possibility of this exemption while negotiating with Appellee prior to filing a third lawsuit. Nor did Appellant suggest Section 3(a)(10) as a possible exemption in his complaint or in his motion for summary judgment. Appellant appears to have first raised the issue of the availability of another exemption at oral argument on the motions for summary judgment, which the district court refused to consider.

10

To preserve an argument first raised in an oral argument before the trial court, "the litigant not only must identify the issue but also must provide some minimal level of argumentation in support of it." *United States of America v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009). Appellant acknowledges that the Section 3(a)(10) exemption was not cited specifically at oral argument but insists that by claiming that Regulation D should not apply "it is axiomatic that another [exemption] should apply." (Appellant Reply Brief at 18.) In noting that the district court rejected Appellant counsel's plea to brief the exemption issue, Appellant suggests that March 13, 2008, "was the first time the court raised a question about the application of Regulation D to this matter." (*Id.* at 19.) Even if the district court only first questioned Regulation D at oral argument, the application of Regulation D to the settlement agreement should have been considered by Appellant long before, since it is the foundation of the subscription agreement demanded by Appellee and forms the basis of Appellant's complaint. Yet, at oral argument before the district court, Appellant still did not suggest which alternate exemption should apply and how else he could have assured Appellee he was not an underwriter. Thus, because Appellant did not "provide some minimal level of argumentation in support" of the application of the Section 3(a)(10) exemption at oral argument, the argument that Section 3(a)(10) should apply is waived.

Moreover, it is hard for Appellant to argue that Regulation D imposes material burdens when Appellant previously agreed to the main term that he alleges creates that material burden. Appellant now asserts that the Section 3(a)(10) exemption to Regulation D is preferable because "it precludes the need to hold the shares for 1 year, and the shares could have been tradable immediately." (Appellant Brief at 39.) However, the February 11, 2005 draft agreement that Appellant signed entitles Appellant to "a letter from IPVoice's counsel regarding [his] ability to freely trade the above

11

identified 300,000 restricted shares of the New Market Technology common stock on February 20, 2006." (Dist. Ct. Dkt. 1-12 at ¶ 9(h).) Since the agreement that Appellant signed required that he would have to hold the restricted stock for one year before selling it, the subscription agreement sought by Appellee imposed no additional material burden upon him.

Moreover, because the subscription agreement is a method for ensuring compliance with Regulation D and therefore did not add material burdens which could not have been contemplated, the additional provisions contained within the subscription agreement, such as the representations and warranties, were also reasonable and necessary to effectuate the settlement. Under Rule 502 of Regulation D, a possible method for complying with the requirement that "[t]he issuer shall exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(a)(11) of the [Securities] Act" is for the issuer to conduct a "[r]easonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons." 17 C.F.R. § 230.502(d). While doing this "will establish the requisite reasonable care, it is not the exclusive method to determine such care." *Id*.

None of the specific terms Appellant takes umbrage with are legally required to comply with Regulation D. Nevertheless, because they are all aimed at ensuring that Appellant is not an underwriter and therefore that Appellee satisfies Regulation D, they are a reasonable method for assuring adherence to the securities laws. "[T]he elicitation of bare representations that the buyer does not have any present agreement to resell is plainly insufficient." *S.E.C. v. Cavanaugh*, 1 F.Supp. 2d 337, 367 (S.D.N.Y. 1998). Therefore, along with present representations and warranties, it is reasonable for the subscription agreement to require indemnifications, post-transaction representations and warranties, and an opinion letter from Appellee's outside counsel before removal

12

of the restrictive legend on the unregistered stock. *See Cavanaugh*, 1 F.Supp. 2d at 367 (citing Securities Act Release No. 3825 (S.E.C. Aug. 12, 1957) and Securities Act Release No. 5121 (S.E.C. Dec. 30, 1970)). Because compliance with Regulation D does not add material burdens, signing a subscription agreement ensuring compliance with Regulation D also does not add material burdens to the contract. Accordingly, the district court did not err by finding that specific terms of the subscription agreement did not add material terms or burdens to the settlement.

Similarly, because Appellant presents the same arguments in contending that the district court erred in denying his motion for summary judgment, the district court's denial of Appellant's motion for summary judgment is affirmed. Beyond arguing that summary judgment should have been granted because the subscription agreement was an additional term to the settlement, Appellant also contends that he detrimentally relied on Appellee's representation that it was negotiating in good faith and therefore lost the ability to bring this dispute before the district court prior to the stock diminishing in value. The district court dismissed the matter on January 6, 2005, with leave to reinstate within thirty days. Appellee notified Appellant that it believed a subscription agreement was necessary on February 28, 2005. Appellant did not bring a cause of action for breach of contract until June 27, 2007, nearly two and a half years later. Any decrease in the value of the stock due to a settlement not being effectuated is a result of Appellant not moving to enforce the settlement while within the jurisdiction of the district court judge or waiting so long to bring a new cause of action. Accordingly, although the district court did not explicitly rule on Appellant's equitable argument, Appellant's motion for summary judgment was appropriately denied.

Moreover, because an appeal from a denial of a Rule 59(e) motion to vacate, alter or amend judgment is generally treated as an appeal of the underlying judgment itself, *Andrews v. Columbia*

13

*Gas Transmission Corp.*, 544 F.3d 618, 623 n.4 (6th Cir. 2008), the district court's denial of Appellant's motion to vacate, alter or amend is also affirmed.

Finally, we would be remiss if we failed to note our dismay at the inordinate amount of judicial resources these two parties have consumed in litigating a private dispute for ten years, through three lawsuits, two botched settlement agreements (one of which involved considerable effort by a magistrate judge), and now this appeal.

## VI. CONCLUSION

For the reasons discussed *supra*, the district court's grant of summary judgment in favor of Appellee, denial of Appellant's motion for summary judgment, and denial of Appellant's Motion to Vacate, Alter or Amend Judgment are hereby **AFFIRMED.**